## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

KAITLIN VASTERLING,

       **Plaintiff,**

v.                                  **Case No. 2:22cv339**

ALISON DIRLE,

       **Defendant.**

## MEMORANDUM OPINION AND ORDER

On the morning of February 16, 2022, Plaintiff Kaitlin Vasterling, at the time a resident of Virginia Beach, Virginia, was driving her six-year-old son Koda to school at Shelton Park Elementary in Virginia Beach. As she was crossing Independence Boulevard in a westerly direction from Joslin Street to Shelton Road, her Honda minivan was struck by Defendant Alison Dirle's white Chevrolet Suburban, which had been traveling south on Independence Boulevard. According to the data recorder recovered from the Suburban, in the few seconds before impact Dirle had been traveling at speeds between 76 and 81 miles per hour. Dirle's Suburban struck Vasterling's minivan in the rear passenger side immediately adjacent to where Koda was sitting, and he was seriously injured. Following her family's move to North Carolina, Vasterling brought this action for her personal injuries in Federal Court under 28 U.S.C. § 1332(a) based on the diversity of citizenship of the parties. ECF No. 1.

Vasterling's Complaint alleged a single count of willful and wanton negligence on the part of Dirle. ECF No. 1. The parties consented to Magistrate Judge jurisdiction, and this case was assigned to the undersigned on January 9, 2023. ECF No. 12. After originally demanding a trial by jury, just before trial the parties withdrew their demand for a jury and agreed to a bench trial.

ECF No. 44.  On May 15, 2023, the Court conducted a one-day bench trial, and, pursuant to Federal Rule of Civil Procedure 52(a)(1), now issues its findings of fact and conclusions of law.

## FINDINGS OF FACT

I.     Stipulated Facts[1]

1.  The accident giving rise to this claim occurred on February 16, 2022, at approximately 8:00 a.m. on a Wednesday.

2.  The accident at issue occurred at the intersection of Independence Boulevard and Shelton Road in Virginia Beach, Virginia.[2]

II.    Facts Found at Trial[3]

### A.  The Accident

1.  The parties agree that Dirle was driving a white Chevrolet Suburban southbound on Independence Boulevard on her way to work that morning, and that the collision occurred as Vasterling was attempting to cross Independence Boulevard from Joslin Street to Shelton Road to take her child to Shelton Park Elementary School.  The diagram below was admitted in evidence and illustrates the area where the accident occurred and the location of the school.

---

[1] These facts, among certain other facts associated with Vasterling's claimed damages—such as her medical bills—were agreed to by the parties in the Final Pretrial Order entered by the Court on April 28, 2023, in preparation for the trial of this matter, and at trial.  ECF No. 33.

[2] The parties also stipulated that jurisdiction and venue were proper in this Court, *id.*, but these are legal conclusions for the Court to decide and are addressed in the Conclusions of Law.

[3] These facts are found based on the evidence presented at the trial of this matter.



*Figure 1*

2. Independence Boulevard is a major thoroughfare in the City of Virginia Beach and, in the relevant area where the accident occurred, consists of two travel lanes going north and two lanes going south, left turn lanes in each direction at Joslin Street and Shelton Road, and a grassy median separating the northbound and southbound travel lanes. The speed limit on Independence Boulevard is 45 miles per hour at all relevant parts of the thoroughfare. At its northern end, Independence Boulevard culminates at Shore Drive in Virginia Beach, where travelers must either turn west towards Norfolk, east towards the oceanfront, or, if they continue straight, directly to Gate 5 of the United States Navy's Joint Expeditionary Base Little Creek-Fort Story. Vehicles accessing the Base through this gate must be cleared individually by guards at the gate, which sometimes causes traffic to back up on northbound Independence Boulevard.[4]

---

[4] To the extent this explanation was not specifically described in the testimony, the Court takes judicial notice of these facts pursuant to Federal Rule of Evidence 201(b) ("The court may judicially notice a fact

3. Shelton Road is a residential two-lane road that intersects with Independence Boulevard from the west approximately 0.3 miles south of Shore Drive. Joslin Street intersects Independence Boulevard across from Shelton Road from the east, such that a vehicle traveling westbound on Joslin Street could cross the travel lanes of Independence Boulevard and the median and straight onto Shelton Road. Shelton Road Elementary School is located approximately 0.2 miles from Independence Boulevard on Shelton Road.

4. The Court accepts the testimony of Vasterling, and specifically finds her testimony regarding how the accident occurred to be credible. At the time of this accident, Vasterling lived with her family in the residential neighborhood east of Independence Boulevard in the area of Joslin Street. She was also approximately eighteen weeks pregnant with her fourth child. Vasterling left her home that morning to bring her six-year-old son Koda to school at Shelton Elementary School where he was a student. Koda was seated in the back on the passenger side of the minivan.

5. As Vasterling came to the stop sign at Joslin Road and Independence Boulevard, traffic going onto the Navy Base was backed up past Joslin Street. As she waited for traffic to clear so she could cross Independence Boulevard, two north-bound uniformed military members halted their vehicles and waved for her to cross. Vasterling then crossed the northbound lanes of Independence Boulevard into the median and waited for the southbound traffic to clear. The photograph below which was admitted into evidence shows the northward view from Shelton Road of Independence Boulevard and the median where Vasterling waited for traffic to clear.

---

that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction[.]").



*Figure 2*

6. After watching for a break in the traffic as several cars went by, Vasterling started across the northbound lanes of Independence Boulevard believing the way to be clear. Although she saw a white SUV in the distance, she judged she could make it across the two southbound lanes of Independence Boulevard safely. After crossing the first, *i.e.,* left travel lane lane, she suddenly heard the sounds of racing engines and saw two vehicles bearing down on her—"a white and blackish-blue blur." The front of her minivan had reached the edge of Shelton Road, and the back half was still in Independence Boulevard's right travel lane when the white SUV, later determined to be Dirle's Suburban, crashed into the rear passenger side of Vasterling's vehicle. The impact of the crash sent the minivan spinning ahead and to the right. The minivan then collided with a Chevrolet sedan, which had been waiting at the stop sign on Shelton Road. The Court specifically finds that the collision occurred in the right travel lane of southbound Independence Boulevard.[5]

---

[5] Traffic Safety Officer Eriale Kera testified that he found a gouge mark in the left travel lane, inferring that the collision could have occurred in that lane. However, the greater weight of the evidence—including the testimony of the witnesses, the skid marks in the right lane visible in the photographs entered as evidence,

7.  Immediately after the impact, Vasterling tried to gain control of the minivan and, after it struck the Chevrolet sedan, got the vehicle to stop and put it in park. She turned around and saw that the back of the minivan was destroyed. She could not see Koda, so she jumped out, looked in the back window, and saw her son had been dislodged from his seat, covered in blood, and was not moving. She started crying and screaming that her son was dead.

8.  At the same time, Michelle Swails was waiting four cars back at the stop sign on Shelton Road after having dropped off her child at Shelton Park Elementary School just moments before. From her position, she witnessed the accident. The Court accepts the testimony of this disinterested third-party witness. While at the stop sign, Swails did not observe the white SUV until immediately before the crash. In her words, the SUV "came out of nowhere" and crashed into the minivan. She did not see a second vehicle.

9.  Immediately after the crash Swails got out of her car to help, first calling 911, and then attending to Vasterling, whom she described as hysterical and screaming about her child. Swails saw Koda lying face down on the floor of the minivan, covered in debris, and sought the assistance of several military members to try to extricate Koda from the minivan. They were unable to do so, and Koda was not removed from the minivan until after rescue services arrived.

10.  While Swails was attending to Vasterling, Dirle, who had exited her vehicle, approached them and was visibly upset. Dirle told the two she was sorry, and that the accident was all her fault.

---

the impact of the collision occurring at the back end of the minivan, and the fact that the blue vehicle could only have avoided being entangled in the collision if it had been traveling in the left lane, since the impact of the collision, had it occurred in the left lane, would have immediately blocked both lanes, necessarily embroiling the blue vehicle in the wreckage—supports the conclusion that the collision occurred in the right travel lane.

11.  At the time of the accident Dirle, who lives in Norfolk, was on her way to work in Virginia Beach on a route she traveled every day.  Her normal route to work took her east on Shore Drive and then south on Independence Boulevard all the way to Bonney Road.  At its intersection with Independence Boulevard, eastbound Shore Drive has two lanes from which a right turn can be made onto Independence.  Dirle was in the left-most right turn lane next to a blue pickup or SUV.  Her intent was to stay in the left lane southbound on Independence until she passed the point where Northampton Boulevard merges from the right onto Independence Boulevard shortly beyond Shelton Road.  (*See* Figure 1).  As both vehicles made the right turn, the blue vehicle in the right-most turn lane veered into Dirle's lane and cut her off.  She was forced to brake, then pulled into the right-most lane and accelerated to pass the blue vehicle.

12.  Dirle testified that she was not angry about being cut off by the blue vehicle, and did not race him in order to get back into the left lane, nor had she any intent to do so.  She claimed she instead merely sped up to pass the blue vehicle before moving back into the left lane.  She testified she was in the left lane traveling at what she thought was 45 miles per hour when the crash with Vasterling occurred.

13.  Police officers, rescue workers and accident investigators reported to the accident scene.  Dirle told them she had grown up in that neighborhood, knew there was a school right off Independence Boulevard, and had attended Shelton Road Elementary as a child.  She also stated that she knew that parents would be bringing their children to Shelton Road Elementary school that morning, and assumed that was what Vasterling was doing.

14.  The Court finds that several parts of Dirle's testimony simply were not credible, including her description of how the accident happened.  First, Dirle's demeanor during her testimony was both evasive and defensive.  Among other things, contrary to the sworn testimony

7

of Swails — a disinterested, third-party witness — Dirle denied telling Swails and Vasterling she was sorry and that the accident was her fault. While she admitted knowing about Shelton Park Elementary School because she went there as a child, she attempted to parse this admission by insisting that she did not know that children would be arriving at school *at 8:00 a.m.* because her children attended school in Norfolk and, therefore, she was unaware what time school would start in Virginia Beach. These denials and attempted exculpatory statements were not credible.

15. Second, it is not credible that a person who goes from a moderate speed while making a right-hand turn from Shore Drive onto Independence Boulevard could accelerate from that speed to 81 miles per hour in a distance of less than 0.3 miles and reasonably believe she was only traveling at 45 miles per hour.

16. Third, the investigator's testimony, *infra*, that when Dirle was traveling at 81 miles per hour she was already cruising at that speed, means she actually attained that speed in *less* than 0.3 miles. This further makes incredible Dirle's testimony that she believed was observing the speed limit. Excessive speed of that nature on a well-trafficked thoroughfare like Independence Boulevard simply does not go unnoticed and does not happen due to mere inattention. Common experience suggests any driver should be and would be well aware of when they were traveling at 76-81 miles per hour, especially on that road.

17. Instead, the most likely and logical explanation for how and why Dirle came to be driving so fast, since she admitted she was not late for work, is that she wanted to get out in front of the blue vehicle which cut her off, in order to get back into the left lane before the Northampton merger. However, instead of allowing Dirle to pass and move into the left lane, that vehicle accelerated in kind in order to prevent being cut off by her. This comports with Vasterling's

testimony that she heard engines "racing" as they approached, and that she saw the blur of two vehicles just before the crash.[6]

18. As a result of the crash, Vasterling's minivan was crushed, especially the entire back half of the vehicle; Dirle's Suburban was crushed in the front end; and the Chevrolet sedan was heavily damaged on the front driver's side.

19. Virginia Beach Police Officer Eriale Kera was called to the scene of the accident as a member of the Police Department's Traffic Safety Unit. His team was activated because of the report that there were serious injuries in the accident. As part of his investigation, he arranged for the recovery of the data recorder in the Suburban. Vehicles such as the Suburban contain a device connected to the air bag which records certain information regarding a vehicle's operation in the seconds before a collision.[7] This information includes speed, braking, engine RPMs, and acceleration of the vehicle. In the Suburban, the data was recorded at half second intervals for up to 2.5 seconds before the crash. The Court recognized Officer Kera as an expert in the field of data recorder interpretation and credits his opinions.

20. Based on his interpretation of the data, Officer Kera determined that the Suburban was traveling at a speed of 81 miles per hour 2.5 seconds before the crash, slowing slightly to 76 miles per hour 0.5 seconds before the crash. The full pre-crash data at half-second intervals, admitted as an exhibit, is shown below.

---

[6] While Swails testified that she only observed the white SUV at the time of the crash, this is not surprising given her angle of observation at the stop sign, where a second vehicle traveling just behind Dirle in the left travel lane of Independence would be obscured by the Suburban, and then, upon the impact of the crash between the Suburban and the minivan, would not be the focus of Swails's attention at all. *See* Figure 2.

[7] The parties stipulated to the chain of custody of the Suburban's data recorder.

 

**Multiple Event Data**

| | 0 |
|---|---|
| Associated Events Not Recorded | No |
| Event(s) was an Extended Concatenated Event | No |
| An Event(s) was in Between the Recorded Event(s) | No |
| An Event(s) Followed the Recorded Event(s) | No |
| The Event(s) Not Recorded was a Deployment Event(s) | No |
| The Event(s) Not Recorded was a Non-Deployment Event(s) | No |

**System Status At AE**

| | |
|---|---|
| Low Tire Pressure Warning Lamp (If Equipped) | ON |
| Vehicle Power Mode Status | Run |
| Remote Start Status (If Equipped) | Inactive |
| Run/Crank Ignition Switch Logic Level | Active |

**Pro-crash data**

| Parameter | -1.0 sec | -0.5 sec |
|---|---|---|
| Reduced Engine Power Mode | OFF | OFF |
| Cruise Control Active (If Equipped) | No | No |
| Cruise Control Resume Switch Active (If Equipped) | No | No |
| Cruise Control Set Switch Active (If Equipped) | No | No |
| Engine Torque (foot pounds) | -32.27 | -29.69 |

**Pre-Crash Data**

| Parameter | -2.5 sec | -2.0 sec | -1.5 sec | -1.0 sec | -0.5 sec |
|---|---|---|---|---|---|
| Accelerator Pedal Position (percent) | 0 | 0 | 0 | 0 | 0 |
| Vehicle Speed (MPH) | 81 | 79 | 79 | 78 | 76 |
| Engine Speed (RPM) | 2816 | 2048 | 2048 | 2048 | 1856 |
| Percent Throttle | 19 | 15 | 15 | 15 | 15 |
| Brake Switch Circuit State | OFF | OFF | OFF | OFF | ON |

*Figure 3*

21.  The data also disclosed that the 81 miles per hour speed at which Dirle was traveling 2.5 seconds before the crash was a cruising speed, meaning that Dirle had reached that speed prior to 2.5 seconds before impact, and thus she was not in the process of accelerating.  In other words, Dirle had reached 81 miles per hour between the time she slowed down when the blue vehicle cut her off making the right turn from Shore Drive onto Independence Boulevard, and at some point less than 0.3 miles beyond Shore Drive.  Further, Dirle did not apply her brakes until 0.5 seconds before the crash.

22. Using Virginia Code § 46.2-880's Tables of speed and stopping distances, Officer Kera calculated that Dirle was traveling at a rate of 115 feet per second during the 2.5 seconds before the crash. In comparison, a vehicle traveling at 45 miles per hour would cover 66 feet per second. Doing further calculations, Officer Kera determined that Dirle's Suburban traveled 285 feet in the 2.5 seconds before the crash. He also determined that Dirle did not apply her brakes until she was approximately 55 feet from impact. Consequently, 2.5 seconds before the crash, Vasterling would have seen Dirle's Suburban nearly a football field's distance away.

B. Results of the Accident

23. The violent force of the crash was extraordinary. The impact of the Suburban striking the minivan at approximately 76 miles per hour caused Koda to be thrown from his seat to the floor, as the point of impact was right where he had been seated. He was unconscious, bleeding, and covered with debris. Vasterling's observation of him in this condition sent her into hysterics, believing he had been killed. Passersby at the scene attempted to extricate Koda from the vehicle, but could not. Rescue workers arrived and were able to get Koda out of the minivan after approximately twenty minutes, where he was rushed to the hospital with serious injuries.

24. Vasterling's physical injuries were relatively minor considering the violent nature of the collision, but she was examined in the emergency room shortly after the accident for contusions to both knees and pain in her left shoulder. Vasterling was approximately 18 weeks pregnant at the time, and was examined for potential complications with her pregnancy. She was seen again in the emergency room on February 25, 2022, for pain in her right hip and right lower quadrant attributable to the accident.

25. While Vasterling's physical injuries were minor, the evidence establishes that her emotional trauma was substantial and ongoing.

11

26. Prior to the accident, for several years Vasterling had been in and out of mental health treatment, including medical management, to deal with anxiety, emotional trauma from her youth, and other issues. Nonetheless, any mental health issues extant before the accident did not substantially interfere with Vasterling's ability to manage her activities of daily living, raise and care for her children, and manage her household, even when her husband, an active-duty member of the United States military, was away on deployment.

27. The emotional distress caused by the accident was severe and immediate, and, in several respects, has been enduring. Vasterling experienced the devastating trauma of being in a violent crash with her six-year-old child. Vasterling herself suffered injuries, she knew her son's seat in the car was at the point of impact, she saw him unconscious and covered in blood, and, unable to retrieve him from the minivan, she reasonably feared he had been killed. Additionally, being in her eighteenth week of pregnancy, she reasonably feared that she might lose her expectant child as well.

28. The Court concludes the emotional distress has been enduring based on the testimony of numerous witnesses, both lay and professional, who relayed the difficulties Vasterling has experienced since February 16, 2022, because of the accident.

29. Amy Keillor is a certified professional midwife who first began working with Vasterling in December 2021 during her fourth pregnancy. She had seen Vasterling on four prenatal visits between December 5, 2021, and February 2, 2022. Keillor noted no indication of depression or anxiety at any of those visits, and never saw the need to refer her for mental health treatment, despite those conditions being part of her history. Following the February 16, 2022, accident, however, Keillor observed and recorded in her notes Vasterling's significant and constant anxiety and stress, so much so that she referred Vasterling for treatment because of the negative

12

impact those conditions could have on her pregnancy. She reported that Vasterling cried throughout her first visit after the accident, as she recounted the details of the crash. Over the course of this pregnancy (Vasterling delivered a healthy baby girl in July, 2022) Keillor personally observed Vasterling suffer through several panic attacks, some of which were precipitated by events which Keillor believed triggered vivid memories of the accident. Vasterling is now expecting her fifth child, and, as Keillor has observed during their prenatal visits for this pregnancy, the stressors resulting from the accident still affect Vasterling on a daily basis.

30. Licensed Clinical Social Worker Carla Poyner has provided counseling service to Vasterling since July 8, 2022. Poyner diagnosed Vasterling with post-traumatic stress disorder ("PTSD"), and has worked with her to address it. Over the course of therapy, Vasterling has experienced significant anxiety, flashbacks, negative thinking, irritability, impatience, crying spells, panic attacks, and periods of depression, all of which is attributed to the accident and has been the focus of Poyner's treatment. Poyner eventually referred Vasterling to a psychiatrist for a medication evaluation based on her increased anxiety and panic attacks. Acknowledging Vasterling's complicated emotional history, Poyner nonetheless attributed Vasterling's PTSD and the attendant sequalae to the accident. While she testified that there was no "endpoint" to Vasterling's need for further treatment, she did not testify that her PTSD would permanently impact her.

31. In addition, Dirle retained Neuropsychologist Scott Sautter, Ph.D., to conduct an independent neuropsychology examination. Dr. Sautter also diagnosed Vasterling with PTSD.

32. On the morning of February 16, 2022, Vasterling's husband Phillip was notified at home by a neighbor that there had been an accident that may have involved his family. He immediately went to the scene where he came upon his wife crying by the side of the road near his

13

now-obliterated minivan, and saw rescuers trying to get his son out of the vehicle. He has noticed clear changes in his wife since the accident, in that she is easily agitated, easily startled, has panic attacks and nightmares, and has developed a stutter. She will isolate herself when troubled, and has frequent flashbacks. Before the accident, she was able to handle the stressors of life in general, and motherhood in particular, much better than she is able to now, even when he was gone from the home on deployments for extended time periods.

33.  Vasterling's mother Catherine Weakley observed that, before the accident, Vasterling was able to handle her affairs and manage her family, even when her husband was on deployment, despite having periodic mental health treatment. However, since the accident, Weakley has observed that Vasterling still struggles with emotional instability and fearfulness. She speaks with her daughter almost daily, and in those conversations, Vasterling can be inconsolable, unable to maintain her composure, and can stutter.

34.  Finally, Vasterling described in some detail the effect this accident has had on her, testifying credibly about the impact.[8] Before the accident, although she periodically underwent counseling and medication treatment for anxiety and other mental health issues resulting from certain events in her childhood, Vasterling was able to manage her household and her family competently, even through her husband's military deployments. During one such deployment, Vasterling arranged and oversaw the sale of the family home.

35.  As a result of the accident, Vasterling has injuries and new mental suffering. She described the fear and panic she felt being in the accident with her son, upon seeing her son's unconscious figure covered in blood, believing him to have been killed, and the anguish she felt when he remained trapped in the destroyed minivan for an extended period of time. She has PTSD,

---

[8] In addition to crediting her testimony as to the emotional toll of the accident, the Court noted Vasterling's occasional but noticeable stutter.

and now finds herself in a frequent state of anxiety. She has nightmares on a daily basis, is extremely sensitive to noises, and has frequent flashbacks. She experiences panic attacks, irritability, and is frequently alarmed whenever one of her children makes a loud noise because her first thought is that they have had an accident. Driving is extremely difficult as she no longer feels safe doing so. She cries often. Having experienced such a severe crash, she was afraid at first that she might have lost her baby. Later, she worried about the effects the accident still might have had on her pregnancy.

36. Since the accident, Vasterling has participated in therapy to learn coping skills to address her PTSD. Recently she was referred to a psychiatrist for potential medication management, which she is willing to try. Despite her treatment efforts, she stated that a day does not go by when the accident has not intruded on her thoughts.

37. As a result of the accident, Vasterling incurred $16,906.03 in medical expenses, including hospital, physician, mental health therapy, and prenatal care and treatment.

## CONCLUSIONS OF LAW

I.   Liability

Vasterling's claim for personal injuries invokes this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). Vasterling is a resident of the State of North Carolina, Dirle is a resident of the Commonwealth of Virginia, and the amount in controversy exceeds $75,000. ECF No. 1 at ¶ 2-4; ECF No. 7 at 1. Neither party disputes these facts,[9] and therefore subject matter jurisdiction in this Court is appropriate. Additionally, because the accident at issue in this case occurred in Virginia Beach, Virginia, which is within the Norfolk Division of the Eastern District of Virginia, the Court finds that venue in this Court is appropriate.

---

[9] *See* n.2, *supra*. To the extent Dirle in her Answer denied that the amount in controversy exceeded $75,000, the Court finds that the injuries complained of exceed this jurisdictional minimum.

By her Complaint Vasterling brought a single claim for willful and wanton negligence against Vasterling. The common law in Virginia[10] provides for three types of negligence claims: simple negligence, gross negligence, and willful and wanton negligence. *Harris v. Harman*, 486 S.E.2d 99, 101 (Va. 1997).

> Simple negligence is the failure to use the degree of care an ordinary person would exercise to avoid injury to another. The second level of negligence, gross negligence, is action which shows indifference to others, disregarding prudence to the level that the safety of others is completely neglected. Gross negligence is negligence which shocks fairminded people, but is less than willful recklessness.

*Id.* (citations omitted). Willful and wanton negligence "is action taken in conscious disregard of another's rights, or with reckless indifference to consequences that the defendant is aware, from his knowledge of existing circumstances and conditions, would probably result from his conduct and cause injury to another." *Alfonso v. Robinson*, 514 S.E.2d 615, 618 (Va. 1999). "An actor guilty of willful and wanton conduct intends his act, but not the resulting harm." *Infant C. v. Boy Scouts of America, Inc.*, 391 S.E.2d 322, 328 (Va. 1990). Intentional violation of a traffic law, without more, will not support a finding of willful and wanton negligence. *Harris*, 486 S.E.2d at 101-02. "The hallmark of this species of tortious conduct is the defendant's consciousness of his act, his awareness of the dangers or probable consequences, and his reckless decision to proceed notwithstanding that awareness." *Infant C.*, 391 S.E.2d at 327. Importantly, "[e]ach case raising an issue of willful and wanton negligence must be evaluated on its own facts, and a defendant's entire conduct must be considered in determining whether his actions or omissions present such a question for a [factfinder's] determination." *Alfonso*, 514 S.E.2d at 618; *see also Huffman v. Love*, 427 S.E.2d 357, 360 (Va. 1993) (holding that, when determining whether the degree of negligence would support a claim for punitive damages and thus was willful and wanton, that "[e]ach case

---

[10] Because the location of the accident was Virginia, its law applies in a diversity action. *Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 420 (4th Cir. 1993)).

16

must be determined on its own set of facts."). "Generally, negligence (whether ordinary, gross, or willful and wanton), contributory negligence, and proximate cause are issues for a [factfinder's] resolution. They only become questions of law to be determined by a court, when reasonable minds could not differ." *Griffin v. Shively*, 315 S.E.2d 210, 212 (Va. 1984).

The Supreme Court of Virginia has addressed the concept of willful and wanton negligence frequently over the years. Careful review of these decisions makes clear that, as emphasized in these decisions, each case must be evaluated by the factfinder on its own facts, with a careful examination of the actor's awareness of the dangers of her entire conduct from her knowledge of the conditions existing at the time. The Supreme Court of Virginia has found willful and wanton conduct under a variety of circumstances. *E.g. Alfonso*, 514 S.E.2d at 619 (holding there was sufficient evidence of knowledge and notice for willful and wanton conduct when a professional truck driver who left his disabled truck in the right travel lane of a dark interstate highway to walk to a rest area for help, without activating his hazard lights or deploying safety flares and reflective triangles despite receiving safety training providing this instruction); *Infant C.*, 391 S.E.2d at 328-29 (holding a plaintiff boy scout sufficiently stated a claim for willful and wanton conduct, as opposed to intentional conduct, where he pleaded that the scoutmaster did not intend to cause harm when he molested the plaintiff); *Webb v. Rivers*, 507 S.E.2d 360, 363 (Va. 1998) (holding a plaintiff sufficiently established facts for the factfinder to decide a defendant who drove 90 miles per hour in a residential neighborhood with a 25 miles per hour speed limit, through a red light, with a blood alcohol content of 0.21% consciously disregarded the rights of others); *Huffman*, 427 S.E.2d at 360 (holding there was sufficient evidence for the factfinder to find a defendant's conduct was willful and wanton when a defendant with prior driving under the influence ("DUI") convictions drove intoxicated, had already collided with another vehicle, drove ten miles an hour

over the speed limit, crossed into the wrong lane of traffic causing the accident, and then left the scene); *Booth v. Robertson*, 374 S.E.2d 1, 3 (Va. 1988) (holding a defendant with a blood alcohol content of 0.22% who drove the wrong way on an interstate highway causing a head-on collision was wantonly negligent).

Conversely, the Supreme Court of Virginia found that willful and wanton conduct was not established in some cases. *E.g. Harris*, 486 S.E.2d at 102 (holding tailgating and speeding on a winding road was not egregious enough to support a finding of willful and wanton negligence); *Clohessy v. Weiler*, 462 S.E.2d 94, 96-97 (Va. 1995) (holding a driver who struck a pedestrian in a residential neighborhood while driving without headlights and a foggy windshield did not exercise willful or wanton conduct); *Puent v. Dickens*, 427 S.E.2d 340, 341-42 (holding there were insufficient factors to justify a finding of wanton negligence when a speeding drunk driver rear-ended a plaintiff and attempted to leave the scene); *Hack v. Nester*, 404 S.E.2d 42, 45 (Va. 1990) (holding that an intoxicated driver with prior DUI convictions who swerved into the opposite lane causing a head-on collision did not show a conscious disregard for the victim's safety); *Baker v. Marcus*, 114 S.E.2d 617, 621 (Va. 1960) (holding a driver's conduct, which included drinking, taking her eyes off the road, and causing a rear-end collision, was simple negligence).

In each of these cases, the Supreme Court of Virginia looked to the totality of the facts and circumstances surrounding the defendants' conduct, carefully evaluating whether the defendant acted with a "conscious disregard of another's rights, or with reckless indifference to consequences that the defendant was aware, from his knowledge of existing circumstances and conditions, would probably result from his conduct and cause injury to another." *Alfonso*, 514 S.E.2d at 618.

Here, the facts and circumstances surrounding Dirle's conduct establish by a preponderance of the evidence that she engaged in willful and wanton conduct when she caused

the collision with Vasterling.  The Court bases this finding on the following factors.  Preliminarily, Dirle's driving at speeds between 76 and 81 miles per hour on Independence Boulevard at 8:00 a.m. constitutes conduct that, at the least, shocks any fair-minded person.  The speed limit on this road is 45 miles per hour.  Independence Boulevard at that time of day is an extraordinarily busy thoroughfare as is commonly known, and as was specifically known by Dirle that day since she observed traffic backed up in the opposite lanes for more than 0.3 miles.  If this case had only been about Dirle's excessive speeding by driving 81 miles per hour on Independence Boulevard, then this might have been a case only of gross negligence.  However, "[w]illful or wanton negligence involves a greater degree of negligence than gross negligence, particularly in the sense that in the former an actual or constructive consciousness of the danger involved is an essential ingredient of the act or omission . . . ." *Boward v. Leftwich,* 89 S.E.2d 32, 35 (Va. 1955).  Dirle's knowledge of the danger involved in her extraordinary speeding based on her knowledge of the existing conditions, and her reckless indifference to the consequences of her actions, pushes her conduct to willful and wanton negligence.  This is so for the following reasons.

First, Dirle was very familiar with this neighborhood, having grown up there as a child and commuting along this thoroughfare every day to go to work.  Dirle also testified she regularly travels this route and regularly gets into the left lane to avoid the traffic.  Therefore, she knew or should have known about the Navy base traffic and its effect on Independence Boulevard, including the heavy volume and regular traffic backups.  She knew or should have known that there are many residential side streets which access Independence without stop lights from the area neighborhoods.  These residential neighborhoods are present on either side of Independence and thus vehicles are regularly turning onto, off of, or crossing Independence Boulevard from the side streets.

19

Second, Dirle knew there was an elementary school just off Independence Boulevard on Shelton Road, because she attended this very school as a child. Even though the school was not situated on Independence Boulevard itself, it was located in very close proximity thereto.

Third, Dirle knew or should have known that neighborhood parents would be traversing Independence Boulevard to get to the school at that time of day. As a former student at that school, she had to have been fully aware that, regardless of the official start time of the school day, parents were likely to bring their children to school at or near 8:00 a.m. Moreover, after the accident Dirle specifically stated to the investigating police officer that she knew Vasterling was going to the school and probably had a child in the vehicle.

Fourth, in a distance of less than 0.3 miles, Dirle accelerated her vehicle from a turning speed to a cruising speed of 81 miles per hour. The only plausible explanation for why Dirle was going nearly twice the speed limit and had achieved that speed over such a short distance is that she was racing another vehicle in order to get into the left lane ahead of that vehicle before reaching the merger point with Northampton Boulevard.

Given the combination of these factors, Dirle's conduct goes beyond that which would simply shock fair-minded people to conduct that demonstrates an egregiously reckless disregard for the rights of others that Dirle had to know would probably result in injury, even if she "hope[d] or even expect[ed] that [her] conduct [would] prove harmless." *Infant C.*, 391 S.E.2d at 328 (citing Restatement (Second) of Torts § 500 comment f (1965)). The evidence has established that Dirle intended her conduct, which was willful and wanton, even if she did not intend the resulting harm.

II.   Damages

"In a negligence action, damages are generally recoverable for the reasonable and proximate consequences of the breach of duty." *Gilliam v. Immel*, 795 S.E.2d 458, 463 (Va. 2017).

The measure of damages "is that amount necessary to compensate the injured party for the damages proximately caused by the tortious conduct." *Lochaven Co. v. Master Pools by Schertle, Inc.*, 357 S.E.2d 534, 537 (Va. 1987). Certainly, the Court "may properly infer mental anguish as well as physical pain from the circumstances of the injury, including the violence with which it was inflicted." *Wallen v. Allen*, 343 S.E.2d 73, 76 (Va. 1986).

Virginia courts have considered cases where someone witnessed a car accident or was in a car accident and whether damages for emotional trauma are warranted. *E.g. Hughes v. Moore*, 197 S.E.2d 214 (Va. 1973); *Myseros v. Sissler*, 387 S.E.2d 463 (Va. 1990); *Gilliam*, 795 S.E.2d 458 (Va. 2017). When a woman witnessed a car crash into her front porch and subsequently suffered nervousness, could not sleep, experienced pain in her chest and arms, and could not breastfeed her child, she was permitted to recover for these "physical injuries which were the natural result of the fright and shock proximately caused by defendant's tortious conduct." *Hughes*, 197 S.E.2d at 220. Importantly, damages can be awarded for emotional disturbance, without physical impact, when the tortious conduct is willful, wanton, or vindictive. *Id.* at 219 ("[W]here conduct is merely negligent, not willful, wanton or vindictive, and physical impact is lacking, there can be no recovery for emotional disturbance alone.").

In another case, a truck was rear-ended by an intoxicated driver and the truck driver developed post-traumatic stress disorder, generalized anxiety disorder, and some depressive features accompanied by sweating, dizziness, nausea, difficulty sleeping and breathing, constriction of his coronary vessels, episodes of chest pain, hypertension, unstable angina, ischemia, loss of appetite and weight, change in heart function, and problems with heart muscle. *Myseros*, 387 S.E.2d at 465. The truck driver in *Myseros* was not allowed to recover damages for

his mental trauma because he only presented evidence of an underlying emotional disturbance and there was an "absence of resulting physical injury." *Id.* at 466.

In *Gilliam*, a defendant rear-ended a plaintiff and the defendant allegedly said "'You black b***h. I don't have insurance. You're not going to get anything out of me.'" *Gilliam*, 795 S.E.2d at 463. The plaintiff wanted to recover for defendant's alleged remarks because "'it relate[d] to the mental anguish of what she had suffered in [the] accident.'" *Id.* The Supreme Court of Virginia held the defendant's remarks did "not flow from the bodily injuries [plaintiff] claimed, the physical impact of the vehicles, or from [defendant's] negligence in the operation of his vehicle." *Id.* at 464. Therefore, the plaintiff's mental anguish caused by defendant's remarks could not be considered in deciding plaintiff's damages. *Id.* The Supreme Court of Virginia noted "[a]lthough we have recognized the independent tort of intentional infliction of emotional distress . . . and negligent infliction of emotional distress . . . [plaintiff] does not allege either cause of action in this case." *Id.* at n.9.

To begin, as previously noted, Vasterling's Complaint alleged a single count of willful and wanton negligence on the part of Dirle. ECF No. 1. Vasterling's Complaint did not include a claim for intentional infliction of emotional distress or negligent infliction of emotional distress. Therefore, because the Plaintiff did not allege these other torts the Court is not awarding damages based on a claim of intentional or negligent infliction of emotional distress. The Court also is only awarding damages to compensate Vasterling for her injuries and is not awarding damages for her son Koda's injuries or anyone else's injuries.

Through her testimony and the evidence presented at trial, Vasterling has established by a preponderance of the evidence that she suffered compensable injuries as a result of this terrible accident. The photographs of the damaged vehicles demonstrate the severity of the impact, as the

rear of the minivan and front end of the Suburban were demolished.  The Chevrolet sedan was severely damaged from the force of the minivan after it was hit by Dirle's Suburban.  The Court does "properly infer mental anguish as well as physical pain" from the evidence presented of this horrific, dangerous accident.  *Wallen*, 343 S.E.2d at 76.  Vasterling's physical injuries include contusions to both knees, pain in her left shoulder, and pain in her right hip and lower right quadrant.  Vasterling also presented evidence of a stutter, hypersensitivity to noise, and more.  Based on the presentation of evidence at trial, Vasterling's stutter and hypersensitivity to noise may be considered physical symptoms she developed in addition to her mental suffering.

First, Vasterling suffered her own personal injuries and therefore she is entitled to recover for her medical expenses and her pain and suffering proximately caused by Dirle's conduct, including her mental anguish. *See Kondaurov v. Kardasha*, 629 S.E.2d 181, 186 ("Mental anguish, when fairly inferred from injuries sustained, is an element of damages."); *see Barnette v. Dickens*, 135 S.E.2d 109, 113 (Va. 1964) (holding that "[o]nce the act or omission is determined to be negligent with respect to the injured party, the negligent party becomes liable for all the [reasonably foreseeable] injurious consequences which result naturally from such act or omission", which can include mental anguish or neurosis).

The reasonably foreseeable consequences of Dirle's willful and wanton conduct include the emotional distress Vasterling suffered because of this accident.  In addition to her mental anguish resulting from experiencing the accident herself, Vasterling suffered emotional trauma from perceiving the state of her six-year-old son who was in the car with her following the accident—unconscious, lying on the floor of the minivan, covered in blood and debris, and believed to be dead.  Dirle is from the area, attended school in the area, and Dirle stated at the scene she knew Vasterling was going to Shelton Elementary and likely had a child in her car.

Therefore, it was reasonably foreseeable to Dirle that driving at such a high speed, in a residential area, near a school, and in the morning when parents are dropping off children, could result in hitting a car with a parent and child. It is reasonably foreseeable that a mother will experience mental suffering and anguish fearing for the safety of her child when they are victims of a horrific accident together, especially when the child's seat takes the majority of the impact of the crash. Also, Vasterling was eighteen weeks pregnant at the time of the accident. By Vasterling's testimony and that of her midwife, Vasterling established that she endured months of anxiety and depression worried over her pregnancy, fearing the damage that may have been done to her unborn baby as a result of this accident. Vasterling's physical and emotional injuries are the reasonably foreseeable injurious consequences that naturally result from Dirle's willful and wanton conduct.

Second, Vasterling's emotional distress and physical manifestations entitle her to damages for her mental anguish. Vasterling now has a stutter, is hypersensitive to noise, suffers repeated nightmares, flashbacks, PTSD, and other sequelae from the accident. Similar to the plaintiff in *Hughes*, Vasterling's mental anguish caused "physical injuries which were the natural result of the fright and shock proximately caused by defendant's tortious conduct." 197 S.E.2d at 220. Unlike *Myseros*, Vasterling has not just presented evidence of an underlying emotional disturbance because Vasterling presented evidence of more than mental health conditions – she has physical conditions, too. 387 S.E.2d at 466. Vasterling's myriad physical and emotional symptoms reflect the constellation of injuries proximately caused by the trauma of this accident. As a result, Vasterling is entitled to recover for the reasonable and proximate consequences of Dirle's willful and wanton negligence. *Gilliam*, 795 S.E.2d at 464.

Vasterling incurred $16,906.03 in medical expenses proximately caused by the accident, an amount which Dirle does not contest. Additionally, based on the testimony of Vasterling, her

family, her midwife and her therapist, the Court finds that Vasterling has suffered and continues to suffer from PTSD, severe anxiety, panic attacks, depressive episodes, irritability, nightmares, flashbacks, nervousness, sensitivity to light, and stuttering, all proximately caused by her involvement in this accident, and her perceptions of the injuries to her son and potential injury, or worse, to her unborn child. While these injuries have been enduring, lasting as they have for fifteen months after the accident with the expectation that they will continue for some period of time, Vasterling has been receiving mental health therapy and now medical management to address her PTSD. Based on Poynter's testimony, the Court declines to find that Vasterling's PTSD and its attendant sequelae are permanent. Accordingly, apart from her medical expenses, the Court finds that Vasterling should be awarded $250,000 for her injuries, including pain and suffering, emotional distress, and mental anguish.

## CONCLUSION

For the reasons stated in detail herein, the Clerk is **INSTRUCTED** to enter judgment in favor of Plaintiff Kaitlin Vasterling. Defendant Alison Dirle is **ORDERED** to pay Plaintiff a total of $266,906.03, plus post-judgment interest. The Clerk is further requested to send a copy of this Memorandum Opinion and Order to all counsel of record.

It is so **ORDERED**.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
May 30, 2023